# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE

## STATE OF TENNESSEE v. EDWARD TALMADGE MCCONNELL

**Direct Appeal from the Criminal Court for Washington County**
**No. 19793, 21834    Arden L. Hill, Judge**

---

**No. E1998-00288-CCA-R3-CD - Decided  May 30, 2000**

---

The appellant, Edward Talmadge McConnell, appeals his convictions by a jury in the Washington County Criminal Court of aggravated rape and failure to appear.  For the offense of aggravated rape, the trial court sentenced the appellant as a repeat violent offender to life imprisonment without parole in the Tennessee Department of Correction.  For the offense of failure to appear, the trial court sentenced the appellant as a career offender to a consecutive term of six years in the Department. On appeal, the appellant presents the following issues for our consideration: (1) Whether the evidence adduced at trial is sufficient to support the appellant's convictions of aggravated rape and failure to appear; (2) Whether the trial court erred in declining to grant the appellant a mistrial; (3) Whether the trial court erred in ruling that the appellant's prior convictions would be admissible for impeachment purposes if the appellant chose to testify; (4) Whether the trial court erred in sentencing the appellant for the offense of aggravated rape.  Following a review of the record and the parties' briefs, we affirm the judgment of the trial court as modified.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed as Modified.**

OGLE, J., delivered the opinion of the court, in which WADE, P.J., and TIPTON, J., joined.

Julie A. Rice, Knoxville, Tennessee, Jeff Kelly and Debbie Huskins, Johnson City, Tennessee, for the appellant, Edward Talmadge McConnell.

Paul G. Summers, Attorney General and Reporter, Michael J. Fahey, II, Assistant Attorney General, Joe Crumley, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I.  Factual Background

A Washington County Grand Jury returned an indictment charging the appellant with raping AP[1] November 14, 1992, while armed with a knife.[2]  Subsequently, a Washington County Grand Jury also issued presentments charging the appellant with failure to appear on August 16,

---

[1] Pursuant to this court's policy, the minor victim will be referred to only by her initials.

[2] The record before this court does not contain the original indictment.  On May 6, 1997, a Washington County Grand Jury re-indicted the appellant on one count of aggravated rape.

1994, for the trial of the aggravated rape charge and with the coercion of a witness, AP, during the month of April 1995. The indictment and presentments were consolidated, and the appellant proceeded to trial for all three offenses on August 11, 1997, the trial concluding on August 15, 1997.

At the appellant's trial, AP testified on behalf of the State. She related that, on November 14, 1992, she was fifteen (15) years old and lived with her father, step-mother, and step-brother in Pinecrest Village Apartments in Johnson City, Tennessee. The thirty-six (36) year old appellant lived with his girlfriend, Brenda, in the same apartment complex. AP's father and the appellant were acquaintances, having at one time been incarcerated together in the same jail. Because her family did not own a telephone, AP occasionally visited the appellant's apartment in order to use his telephone. At the appellant's trial, AP denied that she had ever dated the appellant or engaged in sexual relations with the appellant prior to the November 14, 1992 rape.

On November 14, 1992, at approximately 8:00 p.m., AP went to the appellant's apartment in order to call her boyfriend. Both the appellant and a woman named Anita Thompson were inside the apartment. Upon obtaining permission to use the telephone, AP sat at the kitchen table and talked to her boyfriend. Meanwhile, the appellant and Ms. Thompson began to argue, resulting in Ms. Thompson's departure from the apartment approximately ten minutes after AP's arrival. The appellant then lay down on the couch and asked AP, "Can I f**k you?" AP, who was still talking to her boyfriend[3] on the telephone, responded that she was dating someone and "didn't have sex with anyone."

Upon AP's rejection, the appellant entered the kitchen and began washing dishes. However, the appellant soon turned his attention to AP once again. He approached AP, hugged her, and attempted to hang up the telephone. AP pushed the appellant away and told her boyfriend about the appellant's advances. At her boyfriend's insistence, AP ended the telephone conversation, thanked the appellant for the use of his telephone, and began to walk toward the door to the apartment. The appellant then grabbed AP by her hair and dragged her through the apartment, stopping briefly in a bedroom toward the front of the apartment before moving AP to another, rear bedroom and raping AP. As the appellant dragged AP through the apartment, AP struggled with the appellant and, at some point, kicked and broke a window. The appellant then produced a pocket knife and briefly held the knife against AP's throat. AP could not recall whether the blade was open.

In one of the bedrooms, the appellant threw AP onto a bed, placed a pillow over her face and her upper chest, and removed his clothing. Additionally, in the rear bedroom, the appellant ordered AP to perform oral sex. When AP resisted, the appellant pushed her face onto his penis and forced his penis inside her mouth. The appellant then partially removed AP's shirt and rubbed his penis against her stomach. Finally, he pulled AP's pants down, rubbed his penis against the inside of her leg, and inserted his penis into her vagina.

When he concluded his rape of AP, the appellant "jumped up" from the bed and left the bedroom. He remarked that he could not allow AP to leave. Nevertheless, AP leapt to her feet

---

[3]AP testified that, at the time of the appellant's trial, her boyfriend was deceased.

and ran to the door of the apartment, successfully escaping the appellant. As AP ran from the apartment, the appellant threatened to kill either AP or AP's mother if she reported the rape. AP ran to her apartment and found her uncle, her grandmother, and her step-brother at home. AP's grandmother and step-brother also testified on behalf of the State at the appellant's trial and recalled that, on the evening in question, AP arrived home crying, "screaming and . . . hollering."[4] AP informed her family that she had been raped and then asked a neighbor to call the police.

Several officers of the Johnson City Police Department were dispatched to AP's apartment in response to AP's 911 telephone call, including Sergeant Becky West, Sergeant Michael Harris, and Officer Lori Cox. These officers testified on behalf of the State that, upon their arrival at AP's apartment, AP appeared extremely upset. Specifically, Sergeant Harris recalled that AP was "[v]ery upset, teary eyed, hysterical, semi-hysterical." AP was also reluctant to talk about the rape but provided a brief account of the rape to Sergeant West. Sergeant West conceded at trial that AP neglected to mention to her the appellant's use of a knife. However, before the officers proceeded to the appellant's apartment, Sergeant Harris asked AP whether the appellant had any weapons. AP stated that the appellant had a knife.

The officers then went to the appellant's apartment, but a search of the apartment revealed that the appellant had already fled. During the search, the officers noted that one of the bedrooms was "in disarray" and that a screen had been dislodged from one of the windows. They did not discover any weapons in the apartment other than an ordinary kitchen knife, which was located in the "kitchen area." On the following day, the police obtained a warrant and were able to locate and arrest the appellant.

Chris L. Gillespie, a physician employed by the Emergency Department of the Johnson City Medical Center, testified on behalf of the State that he examined AP on November 14, 1992. At that time, AP recounted to him that she had been raped and threatened with a knife. Dr. Gillespie noted bruises on AP's upper arms and bruises and scratches on her back. The bruises appeared to be "fresh." He did not discover any "lacerations, tears, bleeding, bruising, swelling, [or] bite marks" in AP's vaginal area. However, testing of vaginal fluid removed from AP's vaginal walls and vaginal and genital swabs taken from AP following the rape revealed the presence of semen. Audrey G. Lynch, who was a forensic DNA examiner employed by the Federal Bureau of Investigation Laboratory in Washington, D.C., testified that DNA profiles obtained from the genital swab and from underwear worn by AP on the night of the rape matched the appellant's DNA profile. She observed that the probability of another individual in the Caucasian, Black, or Hispanic population having the same DNA profile as the appellant is one in eighty million people.

Angelo Dalpiaz, an investigator with the Criminal Investigation Division of the Johnson City Police Department, testified on behalf of the State that he interviewed AP on the night of the rape, both at the Johnson City Medical Center and at the Johnson City Police Department. He only spoke with AP briefly at the medical center "because of her emotional condition." Later,

---

[4]AP and her grandmother testified that, at the time of the appellant's trial, they did not know the whereabouts of AP's uncle.

at the police department, AP was still noticeably upset but sufficiently composed to provide a complete statement. Her statement was substantially identical to her testimony at trial. In particular, she again reported that the appellant had used a knife during the course of the assault.

Investigator Dalpiaz also interviewed the appellant on the next day. Following a Miranda warning, the appellant agreed to waive his Miranda rights and provide a statement to the police. In his statement, the appellant recounted that, during the afternoon of the previous day, he had gone to the local bus station and had encountered Anita Thompson. Ms. Thompson offered to have sex with the appellant in exchange for thirty-five (35) or forty (40) dollars. Accordingly, the appellant and Ms. Thompson went to the appellant's apartment, where they ate lunch and engaged in sexual intercourse. Subsequently, AP arrived and requested permission to use the appellant's telephone. While AP was on the telephone, the appellant went to the rear of his apartment and smoked crack cocaine. He and Ms. Thompson then began to argue, and Ms. Thompson left the apartment. The appellant asserted to police that he could not remember anything that happened in his apartment after Ms. Thompson's departure. However, when asked by police what he did after AP left his apartment, he recalled that he tried to telephone his employer and then left the apartment to visit his girlfriend's daughter. The appellant concluded that he had never before engaged in sexual relations with AP and could not believe that he had done so on the previous evening.

Don Squibb, the Clerk of the Washington County Circuit Court, testified on behalf of the State that court files contained an appearance bond releasing the appellant from custody on the charge of aggravated rape of AP. Moreover, the State introduced into evidence a certified copy of the appearance bond reflecting the appellant's release from custody on the condition that he appear before the court on "January 19, 1993, as well as any other times to which the proceedings in connection with the charge herein specified may be continued or further heard, and before any court or judge thereafter having or holding any proceedings in connection with said charge . . . ." The document was signed by the appellant and his sureties on December 4, 1992. The document does not reflect the date on which it was filed with the court. In any event, Mr. Squibb testified that the appellant's aggravated rape case was later scheduled for trial on August 16, 1994, and the appellant failed to appear in court on that date. The State introduced into evidence a certified copy of the capias issued by the Washington County Criminal Court ordering the appellant's arrest due to his failure to appear and further ordering that the appellant be held without bond. According to Mr. Squibb, the appellant next appeared in the Washington County Criminal Court on July 7, 1995.

Finally, in addition to her testimony concerning events on November 14, 1992, AP testified on behalf of the State that a man called her home in April of 1995 and stated that he knew where she lived, knew how to get into her house, and intended to rape her "again." Although the caller's voice was familiar, AP did not recognize the voice. However, the man identified himself as "Eddie." AP did not recall any comments by the caller concerning the pending criminal proceedings.

In defense, the appellant presented the testimony of Timothy Hopson, a former boyfriend of AP, and Donna Norman, the victim's half-sister. Both Mr. Hopson and Ms. Norman testified, in essence, that AP's father, who is white, was a racist and had previously threatened to beat or kill AP if she ever dated or was otherwise intimate with a black man. The appellant in this

case is African-American.

Mr. Hopson also testified that, at the time of the rape, he too lived in Pinecrest Village Apartments in Johnson City. His apartment was located directly across the parking lot from AP's apartment. On the evening of November 14, 1992, he observed AP standing in the parking lot. She was crying and, upon inquiry, informed Mr. Hopson that she had been raped. AP's father then emerged from AP's apartment, whereupon AP also confided to her father that she had been raped by the appellant. According to Mr. Hopson, AP's father indicated that he intended to speak with the appellant, but AP responded, "No, Daddy, don't." AP's father acquiesced and returned to AP's apartment. Later that evening, Mr. Hopson again observed AP standing in the parking lot. This time, however, AP was laughing. Mr. Hopson asserted at trial that he never observed any police officers or police vehicles at AP's apartment. He further observed that AP possessed a reputation as a "liar" amongst residents of the apartment complex.

At the conclusion of the trial, the jury found the appellant guilty of the offenses of aggravated rape and failure to appear but acquitted the appellant of the offense of coercion of a witness. The trial court conducted a sentencing hearing on November 5, 1997. At the sentencing hearing, the State relied largely upon the evidence adduced at trial and the pre-sentence report. The appellant's pre-sentence report reflects a criminal record including prior convictions for driving under the influence of an intoxicant, assault, forgery, secreting personal property, petit larceny, grand larceny, burglary, and aggravated rape. On the basis of the appellant's criminal record, the trial court determined that the appellant was a career offender with respect to his conviction of failure to appear. The court further observed that it had no option other than the imposition of a term of six years incarceration in the Tennessee Department of Correction for that offense. With respect to the appellant's conviction of aggravated rape, the trial court sentenced the appellant as a repeat violent offender to a term of life imprisonment without parole in the Department. Finally, the court ordered consecutive service of the appellant's sentences.

## II. Analysis

**a.    Sufficiency of the Evidence**

The appellant asserts that the evidence adduced at trial is insufficient to support the jury's verdicts. In this regard, the appellant carries the burden of demonstrating to this court that no "reasonable trier of fact" could have found the essential elements of the charged offenses beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Tenn. R. App. P. 13(e). In other words, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

In order to find the appellant guilty of aggravated rape, the jury was required to find beyond a reasonable doubt that (1) the appellant committed sexual penetration of AP, (2) the appellant used force or coercion to accomplish the sexual penetration, (3) the appellant was armed with a weapon, and (4) the appellant acted intentionally or knowingly. Tenn. Code Ann. § 39-13-

502(a)(1) (1997).[5] On appeal, the appellant does not dispute his intentional or knowing use of force or coercion to sexually penetrate AP. In other words, he does not dispute his commission of a rape. However, he does contend that the State failed to establish beyond a reasonable doubt his use of a knife during the commission of the rape. In essence, the appellant challenges the credibility of AP's testimony concerning his use of a knife. In accordance with the above principles, we decline to disturb the jury's credibility assessment and consequent verdict of guilt.

In order to find the appellant guilty of failure to appear, the jury was required to find beyond a reasonable doubt that (1) the appellant knowingly failed to appear at an official proceeding, (2) the appellant was directed to appear by a lawful authority, and (3) the appellant was "lawfully released from custody, with or without bail, on condition of subsequent appearance at an official proceeding . . . at a specified time or place." Tenn. Code Ann. § 39-16-609 (a)(2) (1994). See also T.P.I. Crim. No. 27.02 (1995). On appeal, the appellant asserts that the State presented neither evidence that he was aware of the August 16, 1994 trial date nor evidence that a lawful authority directed him to appear in court on that date. We disagree. A crime may be established by direct evidence, circumstantial evidence, or a combination thereof. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998), cert. denied, _ U.S. _, 119 S.Ct. 1501 (1999). Accordingly, evidence concerning the appellant's release on bond in his aggravated rape case, the appellant's failure to appear at a scheduled trial date, the consequent issuance of a capias ordering his arrest, and the appellant's subsequent, one year absence from proceedings in the Washington County Criminal Court sufficed to support the jury's verdict of guilt of failure to appear. This issue is without merit.

### b. Mistrial[6]

The appellant additionally contends that the trial court erred in declining to grant the appellant a mistrial[7] on the basis of the following occurrences during trial: (1) Sergeant Becky West's reference during trial to a statement by one of the appellant's neighbors; (2) Officer Lori Cox's observation that, when AP reported the rape, the officer recognized the appellant's name; and (3) the prosecutor's reference, during the cross-examination of Timothy Hopson, to the appellant's incarceration "for a long time" pursuant to the charge of aggravated rape of AP.

A mistrial in a criminal case should only be declared in the event of "manifest necessity." Hall, 976 S.W.2d at 147. In other words, the entry of a mistrial is appropriate only if

---

[5]Although the offense of aggravated rape generally requires a mental state of intent, knowledge, or recklessness, Tenn. Code Ann. § 39-11-301(c) (1997), the indictment in this case only charged a mental state of intent or knowledge. The trial court instructed the jury in accordance with the indictment.

[6]We note that the appellant's contentions are virtually unsupported by any citation to authorities and are therefore subject to waiver. Ct. of Crim. App. Rule 10(b); Tenn. R. App. P. 27(a)(7).

[7]Although unclear from the appellant's brief, we assume that the appellant's argument relates to both charges of aggravated rape and failure to appear.

a miscarriage of justice will otherwise occur. <u>State v. Allen</u>, 976 S.W.2d 661, 668 (Tenn. Crim. App. 1997). Moreover, on appeal, our supreme court has observed that

> "[w]hether an occurrence during the course of a trial warrants the entry of a mistrial is a matter which addresses itself to the sound discretion of the trial court; and this court will not interfere with the exercise of this discretion absent clear abuse appearing on the face of the record."

<u>State v. Burns</u>, 979 S.W.2d 276, 293 (Tenn. 1998), <u>cert. denied</u>, ___ U.S. ___, 119 S.Ct. 2402 (1999)(citation omitted). <u>See also Hall</u>, 976 S.W.2d at 147; <u>Allen</u>, 976 S.W.2d at 668. With these general principles in mind, we address the specific occurrences cited by the appellant.

### i. Testimony of Sergeant Becky West

Prior to trial, the appellant filed a motion asking the trial court to prohibit the State from offering hearsay testimony through police officers who had investigated the aggravated rape of AP. The trial court granted the appellant's motion, ordering the prosecutor to instruct his witnesses to avoid hearsay testimony unless the hearsay was encompassed by an exception to Tenn. R. Evid. 802. Subsequently, during the appellant's trial, the State presented the testimony of Sergeant Becky West concerning her investigation of the aggravated rape of AP. During the course of her testimony, the parties agreed to the introduction into evidence of a redacted version of her police report. However, for purposes of cross-examination, defense counsel provided to Sergeant West an unredacted copy of the report. Defense counsel then inquired whether Sergeant West had interviewed any of the appellant's neighbors during the course of her investigation. When Sergeant West replied that she had spoken with one neighbor, defense counsel further inquired whether the neighbor was male or female. Referring to the unredacted report, Sergeant West responded, "I don't recall. I assume it was a female since I said, 'when she heard screaming'. I assume it was a female."

Defense counsel immediately asked to approach the bench and submitted a motion for a mistrial. In support of his motion, defense counsel asserted that the officer's testimony constituted inadmissible hearsay and was prejudicial to the appellant's case. Moreover, while conceding that the sergeant's testimony was inadvertent and "probably [his] fault for not providing [the sergeant] with an excised copy [of her report]," counsel noted the prosecutor's obligation to instruct his witnesses to avoid hearsay testimony.

During the bench conference, the prosecutor stated that he had instructed all police officers present at the beginning of the appellant's trial to avoid hearsay testimony. He conceded, however, that he could not recall if Sergeant West was present at that time or if he otherwise discussed with her the necessity of avoiding hearsay testimony. Sergeant West indicated that she could not recall being instructed to avoid hearsay testimony.

The trial court denied the appellant's motion for a mistrial. The court noted that the sergeant's reference to the neighbor's hearsay statement was a good faith attempt to answer defense counsel's question and that defense counsel had himself provided the officer with the unredacted police report. Moreover, the trial court provided the following curative instruction to the jury:

> Ladies and Gentlemen of the jury, this last statement made by this

witness - - it's been about fifteen (15) or twenty (20) minutes now. Maybe you don't recall, but it had to do with her investigating and going to a neighbor, maybe a next door neighbor, a neighbor, as to what that neighbor said. Please do not consider what that neighbor said because that's hearsay. In other words you're not supposed to consider hearsay unless I tell you to and when it's one of the many exceptions to the hearsay rule. This is not, and you're not to consider what that neighbor may have told Ms. West, this witness. Now, if there's anyone that can't set that aside raise your hand. In other words when you get to discussing this case back there and it comes down to this part of the evidence, don't even consider that - - what this neighbor might have told Ms. West. All of you understand? Proceed.

We decline to disturb the trial court's exercise of discretion in refusing to grant a mistrial on the basis of Sergeant West's testimony. The State concedes and we agree that the testimony constituted inadmissible hearsay. Tenn. R. Evid. 802. However, we also agree that defense counsel must bear some responsibility for the jury's exposure to the hearsay. Tenn. R. App. P. 36(a). Moreover, assuming that the prosecutor neglected to instruct his witness in accordance with the trial court's order, we do not believe that this omission prejudicially affected the verdict in the appellant's case. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). In measuring the prejudicial impact of any misconduct, this court should consider the facts and circumstances of the case; any curative measures undertaken by the court or prosecutor; the intent of the prosecutor; the cumulative effect of the improper conduct and any other errors; and the relative strength or weakness of the case. Id. The record reflects that the prosecutor did attempt to comply with the trial court's order. In any event, it is unclear that any instruction by the prosecutor to Sergeant West would have prevented the objectionable testimony in light of the inadvertent nature of the testimony and defense counsel's role in eliciting the testimony. The trial court instructed the jury to disregard the testimony, and the jury is presumed to have followed those instructions. State v. Nesbit, 978 S.W.2d 872, 885 (Tenn. 1998), cert. denied, ___ U.S. ___, 119 S.Ct. 1359 (1999); State v. Alvarado, 961 S.W.2d 136, 147 (Tenn. Crim. App. 1996). Finally, the State's evidence against the appellant was strong and the cumulative effect of any errors minimal. This contention is without merit.

### ii. Testimony of Officer Lori Cox

During the prosecutor's direct examination of Officer Lori Cox, he inquired whether she could recall any statement by AP to her concerning the aggravated rape. Officer Cox responded,

Just sketchy details. I remember her telling me that she knew him and told me his name. I didn't know him but I recognized his name so that stuck in my mind.

Defense counsel again asked to approach the bench and again requested a mistrial. Counsel argued that the officer's statement that she recognized the appellant's name necessarily implied prior criminal activity by the appellant. The trial court rejected counsel's argument and denied the motion. Defense counsel did not request and the trial court did not provide to the jury a curative instruction.

Again, we cannot conclude that the trial court abused its discretion in denying the appellant a mistrial. Initially, the appellant does not allege any prosecutorial misconduct. In other words, the appellant does not allege nor does the record reflect that the prosecutor intentionally elicited the disputed testimony. Moreover, we agree with the trial court that the testimony does not constitute or even approach evidence that is inadmissible pursuant to Tenn. R. Evid. 404. Additionally, we have already noted that, when the trial court denied his motion for a mistrial, defense counsel did not request a curative instruction. State v. McPherson, 882 S.W.2d 365, 371 (Tenn.Crim.App. 1994); Tenn. R. App. P. 36(a). We also note that the victim, AP, had previously testified without objection by defense counsel that AP's father became acquainted with the appellant when they were incarcerated together in the same jail. Thus, defense counsel's concern about the jury's exposure to testimony suggesting prior criminal activity by the appellant came too late. Tenn. R. App. P. 36(a). In any event, in light of the strength of the State's evidence, we are unable to conclude that Officer Cox's testimony or even AP's vague reference to the appellant's prior incarceration affected the result of the appellant's trial. Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

### iii. Prosecutor's Reference to the Appellant's Incarceration

During cross-examination of Mr. Hopson, the prosecutor inquired whether Mr. Hopson had ever spoken with the police concerning his knowledge of events on the evening of AP's rape. When Mr. Hopson conceded that he had never spoken with police, the prosecutor further asked, "And yet you've known a man has been in jail for a long time." Defense counsel again asked to approach the bench and requested a mistrial. The prosecutor acknowledged his mistake, indicating that he had referred to the appellant's incarceration inadvertently, intending to ask Mr. Hopson whether he was aware that the appellant had been charged with aggravated rape for a long time. At the conclusion of the bench conference, the trial court denied the appellant's motion and further provided the following curative instruction to the jury:

> Ladies and Gentlemen of the jury, you're not to consider whether
> or not the defendant might have been in jail for some time in
> determining his guilt or innocence. Is there anyone that cannot set
> that aside. If so, raise your hand. No hands up. Continue.

The trial court repeated this instruction following the presentation of the parties' proof and prior to the jury's deliberations.

We conclude that the trial court did not abuse its discretion in denying the appellant a mistrial, as the prosecutor's statement did not prejudicially affect the verdict in this case, whether considered in isolation or in combination with the other occurrences cited by the appellant. Harrington, 385 S.W.2d at 759; Judge, 539 S.W.2d at 344. It was undisputed that the prosecutor's remark was inadvertent. Moreover, in this instance, the prosecutor was clearly referring to the appellant's incarceration following his arrest for the aggravated rape of AP. It was a matter of common sense for the jury to know that the appellant was either incarcerated or on bond pending his trial. Cf. Carroll v. State, 532 S.W.2d 934, 936-937 (Tenn. Crim. App. 1975); State v. Smith, No. 01C01-9205-CC-00152, 1995 WL 84021, at *17 (Tenn. Crim. App. at Nashville, March 2, 1995). Indeed, in this case, the jury was necessarily aware that the appellant's bond in the aggravated rape case had been revoked several years earlier due to his failure to appear in court on a scheduled trial date. Additionally, we again presume that the jury

-9-

followed the curative instruction of the trial court. Nesbit, 978 S.W.2d at 885; Alvarado, 961 S.W.2d at 147. Finally, as noted earlier, the State's evidence was strong, and the appellant is not entitled to relief.

### c.      Tenn. R. Evid. 609

The appellant also argues that the trial court erred in ruling that the State could utilize the appellant's 1976 convictions of forgery, larceny, and burglary and his 1978 conviction of burglary to impeach his credibility if he chose to testify at his trial for aggravated rape and failure to appear. Specifically, the appellant contends that the trial court erroneously utilized the test of admissibility set forth in subsection (a) of Tenn. R. Evid. 609. According to the appellant, his 1976 and 1978 convictions were more than ten years old, and their admissibility was governed instead by subsection (b).

On August 2, 1994, the State provided the appellant with notice that it intended to use the following convictions in order to impeach the appellant's credibility should he choose to testify at his trial:

(1)     One 1976 conviction of forgery;
(2)     Five 1976 convictions of larceny;[8]
(3)     One 1976 conviction of burglary;
(4)     One 1977 conviction of arson;[9]
(5)     One 1978 conviction of burglary;
(6)     One 1981 conviction of aggravated rape;
(7)     One 1981 conviction of burglary;
(8)     One 1992 conviction of theft of services.[10]

In response, the appellant submitted a motion to the trial court contesting the State's use of the above convictions. Specifically, the appellant contended that the 1970s convictions should be excluded pursuant to Tenn. R. Evid. 609(b) and that the unfair prejudicial effect of the appellant's 1981 conviction of aggravated rape outweighed any probative value on credibility pursuant to Tenn. R. Evid. 609(a).

On August 11, 1997, immediately prior to the appellant's trial, the trial court

---

[8]The record before this court reflects only four convictions of larceny in 1976. The State might have been referring to the appellant's 1977 arrest for petit larceny. However, the appellant was ultimately convicted of secreting personal property in this 1977 case. In any event, the appellant has never contested the existence of five 1976 convictions of larceny.

[9]The record indicates that this conviction occurred in 1978. Again, however, the appellant has never challenged the asserted conviction or otherwise challenged the adequacy of the State's notice.

[10]Aside from the State's pre-trial notice, the record does not contain any reference to or evidence of the appellant's 1992 conviction of theft of services. Nevertheless, the appellant has never contested the existence of this conviction.

conducted a hearing on the appellant's motion. At the hearing, the State introduced into evidence a "Release Notification" by the Tennessee Department of Correction for the purpose of establishing the age of the appellant's prior convictions under Tenn. R. Evid. 609. The "Release Notification" indicated that, on June 6, 1986, the appellant was released on parole from confinement in the Department pursuant to his convictions for the following offenses: "Arson, Agg Rape, Forge Checks, GL, PL, Burg 3 & 2." Notwithstanding this "Release Notification," the trial court seemingly assumed that the 1970s convictions were more than ten years old and therefore subject to Tenn. R. Evid. 609(b). Inconsistently, the trial court also appeared to suggest that, regardless of the age of the prior convictions, the convictions were admissible if their "probative value outweigh[ed] the prejudicial effect." Applying this balancing analysis, the trial court prohibited the State's use of the 1977 conviction of arson and the 1981 convictions of aggravated rape and burglary. The trial court approved the State's use of the appellant's 1976 convictions of forgery, larceny, and burglary, his 1978 conviction of burglary, and his 1992 conviction of theft of services. With respect to the appellant's 1976 and 1978 convictions, the trial court specifically noted the large number of convictions and the considerable relevance of the convictions to the appellant's credibility.

Rule 609(a) of the Tennessee Rules of Evidence provides that a witness may be impeached by evidence of a prior conviction. However, the prior conviction must be a felony conviction or a conviction of an offense involving dishonesty or a false statement. Id. at (a)(2). Moreover, if the witness to be impeached is the accused in a criminal prosecution, the State must provide "reasonable written notice of the impeaching conviction before trial," and, upon request, the court must determine that the prior conviction's "probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Id. at (a)(3). Our supreme court has noted that two criteria are "especially relevant" in balancing a prior conviction's probative value and unfair prejudicial effect. State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999). First, a trial court should "analyze the relevance the impeaching conviction has to the issue of credibility." Id. Second, the trial court should "'assess the similarity between the crime on trial and the crime underlying the impeaching conviction.'" Id. (citation omitted). See also State v. Galmore, 994 S.W.2d 120, 122 (Tenn. 1999); State v. Farmer, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992).

That having been said, if a prior conviction is more than ten years old, subsection (b) of Tenn. R. Evid. 609 imposes additional prerequisites to admissibility. First, subsection (b) more clearly articulates the type of notice that the State must provide to a criminal defendant. Id. The State must provide "sufficient advance notice of intent to use such evidence to provide [the defendant] with a fair opportunity to contest the use of such evidence . . . ." Id. Moreover, subsection (b) requires a more stringent balancing analysis. Id. While the probative value of a prior conviction less than ten years old need only marginally outweigh its prejudicial effect, the probative value of a conviction more than ten years old must "substantially" outweigh any prejudicial effect. Id.

Thus, the admissibility of a prior conviction for impeachment purposes will depend, in some cases, upon the age of the conviction. The age of the prior conviction will depend, in turn, upon several factors. First, a trial court must determine whether or not the defendant was confined pursuant to the prior conviction. If the defendant was *not* confined, the

age of the conviction is measured by the time elapsed from the date of conviction to the commencement of the current prosecution. Id. If the defendant *was* confined, the age is measured by the time elapsed from the date of the defendant's release from confinement to the commencement of the current prosecution. Id. Time on probation or parole does not constitute confinement. Cohen, Sheppeard, and Paine, Tennessee Law of Evidence § 609.5, at 371 (3d ed. 1995). However, if the probation or parole was revoked, the ensuing confinement may, depending upon the circumstances of the revocation, be utilized in calculating the age of the conviction. Id.

Second, assuming that a defendant was confined pursuant to a prior conviction, a court must determine both the date of the defendant's release from confinement and the date on which the current prosecution commenced. Generally, the date of a defendant's release from confinement is the date on which the defendant left the jail or prison. Id. However, this court recently observed that,

> at least in the case of multiple, consecutive sentences that are not simultaneously imposed, an evaluation of "release from confinement" based upon sentence expiration dates is more consistent with . . . current Rule 609(b) . . . than an evaluation which focuses only on the date the defendant is allowed to leave the incarcerative facility at the end of his final sentence.

See State v. Thompson, No. 01C01-9812-CR-00490, 2000 WL 283878, at *7 (Tenn. Crim. App. at Nashville, March 17, 2000). The rationales underlying Thompson, including the desirability of linking the prescribed ten year period to the appropriate conviction and the greater ease of application, are equally pertinent in cases of multiple, concurrent sentences that are not simultaneously imposed and multiple sentences that are simultaneously imposed, whether concurrent or consecutive. As to the date on which the current prosecution commenced, we conclude that the issuance and execution of an arrest warrant in this case sufficed. See, e.g., Jones v. State, 332 S.W.2d 662, 667 (Tenn. 1960)(the supreme court observed that there are three modes of commencing a prosecution: (1) arresting the offender on a warrant issued by a magistrate; (2) arresting the offender without a warrant; and (3) by presentment, indictment, or impeachment). Cf. Tenn. Code Ann. § 40-2-104 (1997)(for purposes of determining the running of the statute of limitations applicable to an offense, a prosecution is commenced upon the issuance of a warrant); State v. Utley, 956 S.W.2d 489, 494 (Tenn. 1997)(for purposes of triggering a defendant's right to a speedy trial, a prosecution is commenced upon the arrest of a defendant pursuant to a warrant); State v. Mitchell, 593 S.W.2d 280, 287 (Tenn. 1980)(in the context of defining the scope of an accused's right to counsel, the supreme court observed that "[m]ost assuredly the issuance of a warrant, under Tennessee law and procedure, commits the State to a prosecution and 'a defendant finds himself faced with prosecutorial forces of organized society'").[11]

---

[11]Of course, while the State may "commence" a prosecution by a defendant's arrest, the State may not try and convict a defendant, i.e., "put [a defendant] to answer any criminal charge, but by presentment, indictment or impeachment." See TENN. CONST. art. I, § 14; Tenn. Code Ann. § 40-3-101 (1997).

In light of the above guidelines, the State in this case simply did not provide to the trial court adequate information to determine the age of the appellant's 1970s convictions. Accordingly, we cannot say that the trial court erred in assuming that the convictions were more than ten years old. See State v. Stinnett, 958 S.W.2d 329, 330 n. 5 (Tenn. 1997)(the burden of introducing evidence sufficient to support a finding that the requirements of a rule of evidence are satisfied lies with the proponent of the evidence). As noted by the appellant, however, the record suggests that the trial court failed to apply the appropriate balancing analysis. Nevertheless, we conclude that the 1970s convictions were admissible for impeachment purposes. First, we agree with the trial court that the challenged prior convictions are relevant to the issue of credibility. See, e.g., State v. Martin, 642 S.W.2d 720, 724 (Tenn. 1982)(burglary is a crime of dishonesty); State v. Addison, 973 S.W.2d 260, 268 (Tenn. Crim. App. 1997)(larceny is a crime of dishonesty); State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995)(burglary is a crime involving dishonesty); State v. Johnson, No. 02C01-9504-CC-00097, 1997 WL 80970, at *4 (Tenn. Crim. App. at Jackson, February 27, 1997)(larceny and forgery involve dishonesty). Moreover, in addition to the 1970s convictions, the State proffered for impeachment purposes a 1992 conviction of theft of services. State v. Torrence, No. 02C01-9806-CR-00168, 1999 WL 562217, at *3 (Tenn. Crim. App. at Jackson, August 3, 1999)(citing Johnson v. State, 596 S.W.2d 97, 104 (Tenn. Crim. App. 1979))(this court noted that the probative value of convictions that are more than ten years old may substantially outweigh any prejudicial effect if a defendant's criminal record shows a continuing course of dishonest conduct). Also, the impeachment convictions were entirely dissimilar to the current charges of aggravated rape and failure to appear. Finally, with respect to the charge of aggravated rape, the appellant apparently relied at trial upon a defense of consent.[12] Alternatively, his statement to the police suggested intoxication with crack cocaine precluding his formation of the requisite mental state. Thus, the credibility of the defendant was a central issue at trial.

In any event, we cannot conclude that any error "more probably than not" affected the jury's verdicts in this case. Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). With respect to the aggravated rape charge, the State presented a strong case against the appellant. Had the appellant testified at his trial, the record suggests that he would have either reiterated his statement to the police or refuted the statement and alleged consent by the victim. Neither option was promising, and the appellant would presumably have been impeached with his 1992 theft of services conviction. With respect to the appellant's conviction of failure to appear, the State similarly presented a strong case. However, the State's evidence was in part circumstantial. Moreover, it is a defense to a charge of failure to appear that a defendant "had a reasonable excuse for failure to appear at the specified time and place." Tenn. Code Ann. § 39-16-609(b)(2). Nevertheless, the record before this court is devoid of any indication concerning the contents of the appellant's contemplated testimony. Accordingly, it is impossible to determine prejudice. Galmore, 994 S.W.2d at 124-125 (although a defendant is not required to make an offer of proof in order to preserve a Tenn. R. Evid. 609 claim for review on appeal, an offer of proof may be the only way to demonstrate prejudice depending upon the facts and circumstances

---

[12] Opening and closing arguments by defense counsel were not transcribed for purposes of appeal.

of a case). This issue is without merit.

**d.     Sentence for Aggravated Rape**

Finally, the appellant challenges his sentence for the offense of aggravated rape. Again, for this offense, the trial court imposed a sentence of life imprisonment without parole in the Tennessee Department of Correction pursuant to the repeat violent offenders or "three strikes" statute. Tenn. Code Ann. § 40-35-120 (1997). This sentence is reflected in the judgment of conviction entered by the trial court into the record on November 5, 1997. Apparently, however, the trial court perceived a significant possibility that his sentencing determination would be reversed on appeal and also entered into the record, as an exhibit, an "alternative" judgment. With respect to this "alternative" judgment, the trial court found that the appellant was a multiple rapist, Tenn. Code Ann. § 39-13-523 (1997), and sentenced the appellant as a Range II offender to a term of thirty years incarceration in the Department, Tenn. Code Ann. § 40-35-112(b)(1) (1997). In determining the length of this latter sentence, the court considered the following enhancement factors set forth in Tenn. Code Ann. § 40-35-114 (1992): (1) the appellant possesses a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (4) the victim of the offense was particularly vulnerable because of her age; (5) the appellant treated the victim with exceptional cruelty; (7) the offense involved a victim and was committed to gratify the appellant's desire for pleasure or excitement; (8) the appellant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; and (13) the aggravated rape was committed while the appellant was on parole from a prior felony conviction. The trial court found no mitigating factors.

The appellant now contests both the trial court's application of the "three strikes" statute in his aggravated rape case and the trial court's "alternative" sentencing disposition. The State concedes on appeal, and we agree, that the trial court erred in applying the "three strikes" statute. Tenn. Code Ann. § 40-35-120 is only applicable to those defendants committing a specified triggering offense on or after July 1, 1994. Tenn. Code Ann. § 40-35-120, Compiler's Notes. See also H.B. 2759, 98th General Assembly, 1994 Tenn. Laws Pub. Ch. 994, § 6. The appellant committed the aggravated rape of AP on November 14, 1992. However, we conclude that the trial court's "alternative" sentencing disposition is appropriate and modify the trial court's judgment accordingly.

With respect to the trial court's "alternative" sentencing disposition, the appellant specifically challenges the trial court's application of enhancement factors and its consequent imposition of a mid-range sentence. Appellate review of the length of a sentence is de novo. Tenn. Code. Ann. § 40-35-401(d) (1997). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the defendant in his own behalf; and (7) the potential for rehabilitation or treatment. Tenn. Code. Ann. § 40-35-102, -103 (1997), -210 (1992). See also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is upon the appellant to demonstrate the impropriety of his sentence.

-14-

Tenn. Code. Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determination a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The statutorily prescribed procedure for determining the length of a felony sentence is set forth in Tenn. Code Ann. § 40-35-210. The statute in effect at the time of the appellant's offense provided that the presumptive sentence for a class A felony was the minimum sentence in the applicable range. Id. at (c). However, if there are enhancement factors and no mitigating factors, then a court may impose a sentence above the minimum in the range. Id. at (d). Assigning the appropriate weight to applicable factors is generally within the discretion of the trial court when "' balancing the relative degrees of culpability within the totality of the circumstances of the case involved.'" State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996)(citation omitted).

The appellant challenges the trial court's application of Tenn. Code Ann. § 40-35-114 (4), (5), (7), (8), and (13) in determining his sentence for aggravated rape, asserting that his sentence was only subject to enhancement pursuant to Tenn. Code Ann. § 40-35-114 (1). We initially note that, arguably, the appellant's previous history of criminal convictions would alone support the imposition of a mid-range sentence. In any event, we will address the trial court's application of each challenged factor in turn.

With respect to enhancement factor (4), the State bears the burden of establishing that a victim is particularly vulnerable due to age or physical or mental disability. State v. Walton, 958 S.W.2d 724, 729 (Tenn. 1997). In this case, the State argued and the trial court agreed that a fifteen (15) year old victim is inherently vulnerable, echoing our supreme court's recent acknowledgment, in the somewhat different context of applying Tenn. Code Ann. § 40-35-114 (15), that "minors, in a general sense, are limited in their judgment." State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999). However, in the context of applying enhancement factor (4), our supreme court has also observed that

> given the inherent ambiguity in attempting to determine vulnerability solely from one's age, we are unwilling to engage in potentially unfounded presumptions. A person's age alone may have little or no bearing on size, strength or vitality. Thus, unless the State produces evidence of physical or mental limitations at the time of the offense, along with proof of the victim's age, it cannot be presumed that the victim was particularly vulnerable based solely on her age.

State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997). See also State v. Collins, 986 S.W.2d 13, 23 (Tenn. Crim. App. 1998)("[p]roof of age, standing alone, may be insufficient to establish particular vulnerability"). In other words, "the vulnerability enhancement relates more to the natural physical and mental limitations of the victim than merely to the victim's age." State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993). Thus, this court has held that the mere fact that a rape victim was fourteen (14) years old did not render her particularly vulnerable. State v. Hunter, No. 01C01-9410-CR-00335, 1995 WL 623782, at *5 (Tenn. Crim. App. at Nashville, October

-15-

25, 1995).  Similarly, in this case, the mere fact that AP was fifteen (15) years old at the time of the appellant's offense did not warrant the application of the disputed factor.

Rather, in determining whether the State in this case carried its burden of establishing enhancement factor (4), the trial court was required to consider
> (1) whether the victim because of age or mental or physical
> attributes, was particularly unable to resist the crime, summon
> help, or testify at a later date; (2) whether the victim's age
> (extremely old or extremely young) is entitled to additional weight;
> and (3) whether the vulnerability of the victim made the victim
> more of a target for the offense or, conversely, whether the offense
> was committed in such manner as to render the vulnerability of the
> victim irrelevant.

Walton, 958 S.W.2d at 729; Poole, 945 S.W.2d at 96-97.  Considering these factors pursuant to our de novo review, we note AP's testimony at the appellant's trial that, at the age of fifteen (15), she only weighed approximately one hundred (100) or one hundred and ten (110) pounds.  AP's small size possibly rendered her particularly unable to resist the crime.  See State v. Rhodes, No. 02C01-9406-CC-00124, 1995 WL 425046, at *6 (Tenn. Crim. App. at Jackson, July 19, 1995)(enhancement factor (4) may be applied because of a victim's slight size in comparison with that of her attacker).  However, the record does not contain evidence concerning the appellant's size at the time of the offense.[13]  Moreover, it is at least arguable that, in light of the appellant's use of a knife during the commission of the offense, the vulnerability of the victim in this regard was irrelevant.  We conclude that the trial court erroneously applied this factor.

With respect to enhancement factor (5), concerning a defendant's exceptionally cruel treatment of a victim, the facts of the case must "'demonstrate a culpability distinct from and appreciably greater than that incident to' the crime . . . ."  Poole, 945 S.W.2d at 98.  This court has previously observed that this enhancement factor is generally applied in cases involving abuse or torture, State v. Williams, 920 S.W.2d 247, 259 (Tenn. Crim. App. 1995), and also encompasses "mental cruelty," State v. Herron, No. 02C01-9407-CR-00144, 1995 WL

---

[13]At trial, the court permitted Investigator Dalpiaz to testify concerning AP's statement to him following the offense, apparently on the ground that the statement was a prior consistent statement.  Moreover, the trial court permitted the Investigator to read from his police report the relevant portion of the statement into evidence pursuant to Tenn. R. Evid. 803(5).  Finally, the trial court admitted the police report itself as an exhibit.  According to the *police report*, AP indicated that, at the time of the offense, the appellant was "a little taller than [AP], . . . [and] pretty husky . . . ."  Both the police report and AP's statement constitute hearsay and were admitted at trial solely for the purpose of corroboration and not as substantive evidence.  Of course, reliable hearsay may be admitted at a sentencing hearing, provided that the opposing party is permitted an opportunity to rebut the evidence.  Tenn. Code Ann. § 40-35-209(b) (1992).  However, even assuming that the police report and the statement contained therein constitute reliable hearsay, the appellant was not afforded an opportunity of rebuttal due to the State's sole reliance upon AP's age to establish the applicability of Tenn. Code Ann. § 40-35-114(4).

120230, at *4 (Tenn. Crim. App. at Jackson, March 22, 1995). In this case, the trial court relied upon "the extensive force used . . . [by the appellant] and a pillow over . . . [the victim's] head and a knife at . . . a young girl's throat." Preliminarily, we agree with the appellant that his use of a knife was an essential element of the charged offense of aggravated rape. Tenn. Code Ann. § 39-13-502(a)(1). Nevertheless, we also agree with the trial court that the appellant's use of force sufficient to cause AP bodily injury was not. More importantly, we note that, in addition to vaginally raping AP, the appellant forced AP to perform oral sex. Finally, the appellant threatened to kill either AP or her mother if AP reported the rape. In short, the evidence adduced at trial supports the application of this enhancement factor.

We additionally approve the trial court's application of enhancement factor (7), concerning a defendant's commission of a crime in order to gratify his desire for pleasure or excitement. Our supreme court has previously observed that not all rapes are committed for the purpose of pleasure or excitement. State v. Carico, 968 S.W.2d 280, 286 (Tenn. 1998). Nevertheless, the evidence adduced at the appellant's trial established that, on the day of the rape, the defendant hired a prostitute and engaged in sexual intercourse with the prostitute. Immediately prior to the rape, the appellant and the prostitute argued, resulting in the prostitute's departure from the appellant's apartment. Deprived of one source of pleasure or sexual gratification, the appellant turned to another potential source. He asked AP if she would engage in sexual intercourse with him and also attempted to embrace her. Only upon encountering resistance did the appellant use force. Additionally, as noted earlier, the appellant rubbed his penis against AP's stomach and leg and forced her to perform oral sex prior to penetrating her vaginally. These facts, in addition to evidence of the appellant's ejaculation, support a finding that the appellant raped AP in order to gratify his desire for pleasure or excitement. State v. Gilbert, No. 03C01-9808-CC-00303, 1999 WL 817473, at *3 (Tenn.Crim.App. at Knoxville, September 29, 1999), perm. to appeal denied, (Tenn. 2000).

The trial court also applied enhancement factor (8), concerning a defendant's previous history of unwillingness to comply with the conditions of a sentence involving release in the community. The trial court applied this factor on the basis of the appellant's commission of the aggravated rape of AP while allegedly on parole pursuant to prior convictions of aggravated rape and burglary. Even assuming that the appellant was on parole at the time of the instant offense, we have held that application of this factor under these circumstances is inappropriate. State v. Hayes, 899 S.W.2d 175, 185-186 (Tenn. Crim. App. 1995); State v. Davis, No. 03C01-9712-CR-00543, 1999 WL 135054, at *10 (Tenn. Crim. App. at Knoxville, March 15, 1999), perm. to appeal denied, (Tenn. 1999).

Nevertheless, in contrast to the appellant, this court does not find the application of this enhancement factor "unfathomable." The record in this case otherwise and overwhelmingly reflects the appellant's failure in the past to comply with the conditions of sentences involving release in the community. Specifically, the record reflects that, on June 4, 1976, the appellant was convicted in the Washington County Criminal Court of forgery, larceny, and burglary. The trial court imposed an effective sentence of three years incarceration in the Tennessee Department of Correction. However, the record suggests that the trial court granted the appellant probation. In any event, the appellant committed another burglary soon thereafter,

on November 14, 1976. Moreover, on January 24, 1977, the appellant committed the offenses of burglary and arson. He was subsequently arrested, only to be released on bond. While released on bond, on August 2, 1977, the appellant committed the offense of secreting personal property. He was convicted of this offense in the Washington County Criminal Court on October 25, 1977, and received a suspended sentence of five months and twenty-nine days. On March 27, 1978, the appellant was convicted in the same court of the November 14, 1976 burglary and the January 24, 1977 burglary and arson. For these offenses, the trial court imposed an effective sentence of six years incarceration in the Tennessee Department of Correction and further ordered that the appellant serve this effective sentence consecutively to his 1976 sentence of three years. Nevertheless, the appellant was soon released into the community once again and, on October 19, 1979, committed the offenses of burglary and aggravated rape. He was convicted of these offenses in the Washington County Criminal Court on April 9, 1981, and received an aggregate sentence of at least twenty years incarceration in the Department. As noted earlier, the record reflects that the appellant was released on parole on June 6, 1986, following his confinement pursuant to convictions of "Arson, Agg Rape, Forge Checks, GL, PL, Burg 3 & 2." His parole and "sentence" expired on April 25, 1991. However, in 1987, prior to the expiration of his parole and "sentence," the appellant committed the offenses of driving under the influence of an intoxicant and assault upon a female in the state of North Carolina and was convicted of these offenses during the same year.

Finally, we do agree with the appellant that the trial court improperly applied enhancement factor (13), concerning the appellant's commission of the aggravated rape of AP while on parole pursuant to a prior felony conviction. Again, according to the record, the appellant's parole and "sentence" pursuant to his convictions of "Arson, Agg Rape, Forge Checks, GL, PL, Burg 3 & 2" expired on April 25, 1991, more than one year prior to the instant offense. The record simply does not contain any evidence that the appellant remained on parole thereafter.[14]

In sum, we agree with the appellant that the trial court erred in applying enhancement factors (4) and (13). However, the appellant is not necessarily entitled to a reduction of his sentence for the offense of aggravated rape. State v. Lavender, 967 S.W.2d 803, 809 (Tenn. 1998). Rather, we conclude that the remaining enhancement factors amply support the trial court's imposition of a mid-range sentence of thirty years incarceration in the Department.

### III. Conclusion
For the foregoing reasons, we affirm the judgment of the trial court in the failure to appear case. We also affirm the judgment of the trial court in the aggravated rape case but

---

[14]We note that the "Release Notification" issued by the Tennessee Department of Correction only refers to second and third degree burglary convictions. The appellant's 1981 conviction of burglary was a first degree burglary conviction, for which the appellant received a sentence of five to ten years incarceration in the Department. This sentence was consecutive to his fifteen year sentence for aggravated rape.

modify the judgment to reflect the appellant's sentence, as both a multiple rapist and a Range II offender, to thirty years incarceration in the Tennessee Department of Correction, this sentence to be served consecutively to the appellant's sentence for failure to appear.