IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 7, 2001 Session

## STATE OF TENNESSEE v. ROBERT A. CUMMINS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 98-08052     James C. Beasley, Jr., Judge**

---

**No. W2000-00277-CCA-R3-CD  - Filed August 10, 2001**

---

The defendant, Robert A. Cummins, was convicted of first degree felony murder.  The trial court imposed a sentence of life imprisonment with the possibility of parole.  On appeal, the defendant presents two issues: (1) whether the trial court erred by denying his motion to suppress; and (2) whether the trial court erred by failing to instruct the jury as to any lesser included offenses of first degree felony murder.  Because the trial court erred by not charging the jury with the lesser included offenses of felony murder, the judgment is reversed and the case is remanded for a new trial.

**Tenn. R. App. P. 3; Judgment of the Trial Court Reversed and Remanded.**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

Jeffery S. Glatstein, Memphis, Tennessee, for the appellant, Robert A. Cummins.

Paul G. Summers, Attorney General & Reporter; J. Ross Dyer, Assistant Attorney General; and Jerry Kitchen and Reginald Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

On the evening of February 26, 1998, Jeff Creel was driving east in Desoto County, Mississippi, near Memphis when he discovered the victim, James Meeks, lying on the left shoulder of the road.  Creel immediately called 911 on his cellular phone and, within minutes, medical personnel and police officers arrived at the scene.

Jeff Pounders, Desoto County Coroner, testified that the victim had a shoe and a sock missing and that his pockets had been pulled inside out.  The coroner stated that there was a small gunshot wound to the back of the head and a laceration on the forehead.  Police found an abandoned car about one-half mile from the body.  There was blood inside the vehicle.  The coroner testified that the victim was still alive when he arrived at the scene, but that he subsequently "lost a pulse."

Dr. O'Brian Clary Smith, Shelby County Medical Examiner, testified that the victim died as a result of a gunshot wound to the head. It was his opinion that the victim would have been unable to take any voluntary action after the infliction of the wound. Dr. Smith estimated that the gun was discharged within 24 inches of the victim's head. He testified that he could not determine the exact caliber of the murder weapon because there was an inadequate amount of lead fragment to examine. Dr. Smith determined that a low-velocity weapon, such as a .22 or .25 caliber, was used to kill the victim.

Jodie Dickey, a waitress, testified that at approximately 2:00 p.m., on the day before the body was discovered, Kassy Janikowski stopped by her house to take her to work. She recalled that Ms. Janikowski came inside the restaurant later that day and asked if she knew where to get a gun. Ms. Dickey answered in the negative and Ms. Janikowski then asked if she would be willing to buy a gun for her to use. When she refused, Ms. Janikowski explained that she wanted the gun "because she was going to rob somebody." Ms. Dickey testified that she then asked whom she intended to rob and Ms. Janikowski replied, "[I] would rather not say," explaining only that she needed "back-up."

Ms. Dickey testified that on the next day, Ms. Janikowski was accompanied by the defendant and Kevin Gray when she arrived at her home to drive her to work. After the three transported her to the restaurant, they left and returned 30 minutes later. Ms. Dickey testified that Ms. Janikowski then asked to borrow $25.00 and promised that she would have $400.00 to $600.00 within the hour.

Thomas Roberts testified that at 7:30 a.m. on the day of the murder, he was sleeping at Daniel Gray's house when the defendant, Kevin Gray, and Ms. Janikowski awoke him. Ms. Janikowski told Roberts that because she had no gas in her car, she needed a ride home. Roberts recalled that he drove the three of them to the Janikowski house and waited outside while Ms. Janikowski and Kevin Gray went inside. He testified that Ms. Janikowski's parents left the house shortly after his arrival and that Ms. Janikowski and Gray returned to his vehicle about 30 minutes later with a .22 caliber pistol. Roberts, who acknowledged that he stopped the car on the side of the road on their return trip home to fire the pistol, testified that Kevin Gray also fired the weapon. He recalled that upon returning to Daniel Gray's house, one of the three in the car stated an intention to rob "a dope dealer." Roberts acknowledged, however, his statement to the police following this offense in which he recounted that the defendant, Gray, and Ms. Janikowski later "changed their story and . . . said , 'We're going to sell this gun to pay to get some drugs.'" In any event, Roberts testified that when they left the Gray residence, the defendant had the gun in his possession. At approximately 6:30 p.m. on the same day, Roberts tried to page the victim in order to arrange a marijuana purchase. He explained that the victim, who was usually prompt in returning phone calls, did not return the message. At about 1:00 a.m., Roberts again saw the defendant, whom he described as not "acting like himself." Roberts testified that the defendant, who was not a cocaine user, offered him some crack.

Captain Randy Doss of the Desoto County Sheriff's Department testified that the victim's car was discovered one-half mile west of the body. There was a jacket in the backseat and what appeared to be blood on the seats. Captain Doss testified that there were shoe prints beside the victim's car. When it was determined that a plaster mold of one of the prints matched a shoe

belonging to Ms. Janikowski, she and Kevin Gray were arrested. While in custody, they accused the defendant, who was then 16 years old, of shooting the victim. Gray then led police to the defendant's residence.

Two days after the murder, Captain Doss went to the defendant's residence in Mississippi, met with the defendant's father, and then asked the defendant to accompany him to the sheriff's department for questioning. Captain Doss advised the defendant of his Miranda rights when he placed him in the police car and again when they reached the sheriff's department. According to Captain Doss, the defendant read about one-half of the waiver form aloud and silently read the rest. Initially, the defendant claimed that Kevin Gray committed the murder. Later, the defendant admitted that he, Gray and Ms. Janikowski killed and robbed the victim. While conceding that he held the pistol to the victim's head, the defendant maintained that he never intended to shoot. He claimed that the gun went off accidentally. After Captain Doss put the statement in writing, the defendant read the content and initialed corrections.

Officer Doss, who did not obtain an arrest warrant for the defendant, testified that he knew that the defendant was 16 years old. He explained that under Mississippi law, the defendant was not considered a juvenile because he was over the age of 13 and was suspected of involvment in a violent crime. He recalled that the defendant was nervous at the time of his arrest and stuttered a little.

In his statement to police, the defendant said that after Ms. Janikowski "stole" the gun from her parent's house, Kevin Gray asked him if he wanted to make some money. When he answered affirmatively, Gray revealed their intentions to rob a "dope dealer." The plan was that Gray would page the victim, arrange to meet him behind Mega Market grocery store, and hold him at gunpoint from the backseat of his vehicle. It was their plan to force the victim to drive to Lakeview Trailer Park in Memphis, take his "dope" and money, and then "haul ass." The defendant contended that when the victim arrived, he stepped into the backseat of the victim's vehicle and pulled out the gun. He claimed that he "got all shaky and . . . the gun went off." The defendant told Captain Doss that Gray, who was in the front passenger's seat, then got out of the vehicle and directed him to push the victim out from under the steering wheel. The defendant stated that he refused and Ms. Janikowski pushed the victim over in order to drive the vehicle. The defendant claimed that he and Gray traveled to Lakeview Trailer Park where they waited for Ms. Janikowski. After 20 minutes or so, they left the trailer park and soon afterward observed the victim lying on the left side of the road. The defendant stated that Gray threw the gun away at a sewer plant. When they reached the defendant's house, Gray, who had taken crack cocaine from the victim after he was shot, gave the defendant half of the cocaine and informed him that he would return later with the other half of the money he had stolen. According to the defendant, Gray then left to look for Ms. Janikowski.

Dr. Sam Craddock, a clinical psychologist, testified that he examined the defendant in order to determine if he was competent to stand trial. Dr. Craddock believed that the defendant "portrayed himself in a mildly deceptive fashion." He testified that there were times that the defendant could remember very little about the circumstances of the crime, but, at other times, that he was able to provide detailed information. Dr. Craddock concluded that the defendant had no serious mental

illness and borderline intelligence. He stated that the defendant would be susceptible to the suggestions of others. Dr. Craddock also testified that the defendant would probably not be able to comprehend such words as "leniency" and "coercion," but that he would be able to understand the words and phrases contained in the Miranda warnings.

The defendant did not testify at trial.

I

Initially, the defendant claims that the trial court erred by denying his motion to suppress his confession to the police. We disagree. At the hearing on the motion to suppress, Captain Doss testified that he went to the defendant's residence in Walls, Mississippi, at approximately 12:30 a.m. on February 28, 1998, and "took [the defendant] into custody" shortly thereafter. He provided Miranda warnings to the defendant after placing him in the vehicle. According to Captain Doss, the defendant stated that he understood the rights and was willing to answer questions. Captain Doss testified that he administered Miranda warnings in writing to the defendant when they reached his office at 1:30 a.m. The defendant initialed each line of the waiver of rights form. Captain Doss testified that the defendant had no difficulty in reading and writing and, while acknowledging that he was involved in the crime, claimed that Gray had fired the fatal shot. Eventually, however, the defendant confessed to shooting the victim. His statement was reduced to writing and he initialed changes. Captain Doss testified that he never made any promises of leniency or coerced the defendant in any way. He acknowledged that he had no arrest warrant and that he handcuffed the defendant before transporting him to the sheriff's department. While recalling that the defendant stuttered, Captain Doss claimed that he did not notice any mental problems. He testified that several officers were in and out of the room during the confession, but that he alone provided Miranda warnings.

During the suppression hearing, Curtis Cummins, the defendant's father, testified that two plain clothes officers and a uniformed officer arrived at his residence at 1:00 a.m. on February 28, 1998. He recalled an officer saying that they wanted to question the defendant about a homicide. Cummins testified that when the defendant came out of his bedroom, the officers informed him that they intended to take him to the Desoto County Sheriff's Department for questioning. Cummins claimed that he asked the officers to wait so that he could get dressed, but they explained that they were only going to ask questions of the defendant.

Dr. Craddock testified at the suppression hearing that the defendant's school records suggested that he could read only at a second-grade level. He explained that the defendant was on the borderline range of functioning and that he was likely to be easily persuaded.

First, the defendant argues that his statement to police should have been suppressed because it was based on an illegal arrest. He contends that the state should have obtained an arrest warrant prior to seizing him at his residence. The state maintains that the defendant was not arrested until after he confessed. Further, the state argues that if the defendant had been arrested, there was probable cause to warrant the arrest.

-4-

The fact that an accused has been unlawfully arrested only becomes relevant when any evidence tainted thereby is sought to be introduced by the state. An illegal warrantless arrest or an arrest made under the color of an invalid warrant has no adverse effect upon an indictment or a presentment returned by a grand jury subsequent to the arrest. Jones v. State, 332 S.W.2d 662, 667 (Tenn. 1960); Nelson v. State, 470 S.W.2d 32 (Tenn. Crim. App. 1971). Even if an arrest is illegal, a confession which follows might be purged of the primary taint. Dunaway v. New York, 442 U.S. 200 (1979); Brown v. Illinois, 422 U.S. 590 (1975); State v. Chandler, 547 S.W.2d 918 (Tenn. 1977).

If the officers had probable cause to arrest the defendant, the confession would not be tainted. If the arrest was illegal, pretextual, or based upon inadequate probable cause, the fruit of the poisonous tree doctrine applies. Wong Sun v. United States, 371 U.S. 471, 485 (1963). An incriminating statement, however, may nevertheless be admitted if found to be voluntary and "sufficiently an act of free will to purge the primary taint." Id. at 486. Miranda warnings, standing alone, do not always purge the taint of an illegal arrest. See State v. Chandler, 547 S.W.2d 918 (Tenn. 1977).

Probable cause has been defined as follows:

[W]hether at [the] moment [of arrest] the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed . . . an offense.

Beck v. Ohio, 379 U.S. 89, 91 (1964).

The minimum standard for arrests is found in Tenn. Code Ann. § 40-7-103(3), which provides that an officer may make a warrantless arrest for a felony when "he has reasonable cause for believing the person arrested . . . committed [the crime]." Our courts make little, if any, distinction between the terms "reasonable cause" and "probable cause" in determining whether there exists a basis for an arrest. See State v. Melson, 638 S.W.2d 342 (Tenn. 1982), cert. denied, 459 U.S. 1137 (1983). In 1975, our supreme court stated that

[i]n dealing with probable cause, one deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

State v. Jefferson, 529 S.W.2d 674, 689 (Tenn. 1975).

Here, Captain Doss testified that evidence found at the scene of the crime led police to Ms. Janikowski and Gray, who were subsequently arrested. While in custody, they implicated the defendant in the crime. Officers went to his residence with the intention of taking him to the sheriff's department for interrogation. According to the defendant's father, the officers refused to let him

travel with his son and informed him that they would return his son within an hour. The defendant was then handcuffed and advised of his rights.

In our view, the defendant was in custody. His freedom of movement was restrained. See Stansbury v. California, 511 U.S. 318, 322-23 (1994); State v. Bush, 942 S.W.2d 489, 499 (Tenn. 1997). Nevertheless, the officers had probable cause for the warrantless arrest. Gray and Ms. Janikowski had accused him of the crime. The arrest, therefore, was lawful and did not taint the defendant's statement.

Next, the defendant argues that his statement to police was not voluntary and should have been suppressed by the trial court based on his age, education and intelligence. The state contends that there is no evidence that the statement was anything but voluntary.

In finding that the defendant's confession was voluntary, the trial court ruled as follows:

[There is] no basis for a determination that this statement was coerced. There is no proof that the defendant felt intimidated to give this statement. Captain Doss testified that he continued to receive information throughout the interview process but that there was no effort to overpower the defendant[']s will by having other officers present during this interview. There was no proof presented to counter this testimony. There is no proof that the defendant asked for an attorney, there is no proof that the defendant asked for his father, and there is no proof that the defendant felt intimidated or coerced to give this statement. Therefore there is no basis for the court to determine anything other than that this statement was given freely and voluntarily after a proper advice of rights.

\*\*\*

The Court finds the proof presented that the defendant understood his rights and therefore was able to freely and voluntarily waive them. There is no proof that the defendant did [not] know or understand his rights[,] only proof that because of his lack of auditory hearing and comprehension skills, he might not be able to understand complex words and issues. The Advice of Rights Form in this case was not complex.

\*\*\*

The proof presented was that [the] two co-defendants were arrested and implicated [the defendant]. Officers went to his home and took him into custody based upon those statements . . . . Captain Doss testified that in Mississippi even a sixteen-year-old who is charged with murder is treated as an adult . . . He was not detained for an excessive period of time. There was no proof that during that time he was pressured, coerced or threatened in any way.

-6-

It is the duty of the trial judge to determine the voluntariness and the admissibility of a defendant's pretrial statement. State v. Pursley, 550 S.W.2d 949, 952 (Tenn. 1977). The trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions about witness credibility and "resolution of conflicts in the evidence are matters entrusted to the trial judge." Id. Testimony presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). If the "greater weight" of the evidence supports the court's ruling, it will be upheld. Id. Yet, this court must conduct a de novo review of the trial court's application of law to fact. State v. Bridges, 963 S.W.2d 487 (Tenn. 1997); State v. Yeargan, 958 S.W.2d 626 (Tenn. 1997).

In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court ruled that before a custodial interrogation, police officers must advise a defendant of the right to remain silent and the right to counsel. If these warnings are not given, any statement elicited from a defendant is not admissible in trial. Dickerson v. United States, 530 U.S. 428, 444 (2000); Stansbury v. California, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made "voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 479; State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). In order for an accused to effect a waiver, he must be adequately appraised of his right to remain silent and the consequence of deciding to abandon it. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). In determining whether a confession was voluntary and knowing, the totality of the circumstances must be examined. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997).

The evidence here does not preponderate against the trial court's determination that the defendant's waiver was voluntary. Captain Doss testified that the defendant was informed of his Miranda rights in the police cruiser and again at the sheriff's department. The officer confirmed that the defendant read aloud more than half of the waiver of rights form before he signed the document. There was no contrary testimony. Dr. Craddock's observation that the defendant had limited comprehension and understanding should not, necessarily, render the statement involuntary. See State v. Perry, 13 S.W.3d 724, 738 (Tenn. Crim. App. 1999) (citing State v. Bell, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985)); State v. Greer, 749 S.W.2d 484, 485 (Tenn. Crim. App. 1988); State v. Kelley, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984). The trial judge, who heard all of the testimony, ruled that the defendant understood his Miranda rights. There is adequate evidence to support the trial court's conclusion that the defendant's waiver was knowing and voluntary.

II

The defendant next argues that the trial court should have instructed the jury on the lesser included offenses of felony murder. In particular, he maintains that the trial court should have charged second degree murder. The state contends that second degree murder is not a lesser included offense of first degree felony murder and thus no error was committed.

In finding for the state, the trial court ruled as follows:

[Second degree murder is] not included in murder in the perpetration of a robbery. It only requires a killing in the perpetration of a robbery and it doesn't even allow for – they've taken out reckless killing during the perpetration of a robbery. It's strictly a killing at this point. So whether it's reckless, or whether it's negligent, or whether it's knowing, or intentional, if it's a killing during the perpetration of, or attempt to perpetrate a robbery it's murder in the perpetration of a robbery. And under those circumstances I don't know that there are any included offenses. . . .

In State v. Burns, 6 S.W.3d 453 (Tenn. 1999), our supreme court revised the standards for the determination of lesser included offenses. In a companion case, State v. Dominy, 6 S.W.3d 472 (Tenn. 1999), our high court confirmed that it had overruled that portion of State v. Trusty, 919 S.W.2d 305 (Tenn. 1996), in which it had established a distinction between lesser grades or classes of offenses and lesser included offenses. In Burns, the court adopted a modified version of the Model Penal Code in order to determine what constitutes a lesser included offense:

An offense is a lesser included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>(1) a different mental state indicating a lesser kind of culpability; and/or

>(2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

>(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

>(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in part (a) or (b); or

>(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Burns, 6 S.W.3d at 466-67.

Here, the defendant was convicted of first degree felony murder. It is defined as:

A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy.

Tenn. Code Ann. § 39-13-202(a)(2).

By comparison, second degree murder is defined as follows:

(1) A knowing killing of another.

Tenn. Code Ann. § 39-13-210(a)(1).

In our view, the opinion of this court in State v. Laconia Lamar Bowers, No. 1999-00170-CCA-R3-CD (Tenn. Crim. App., at Knoxville, Jan. 11, 2000), aff'd, State v. Ely, ____ S.W.3d ____ (Tenn. 2001), is instructive on this issue. In Bowers, the defendant was indicted for first degree felony murder and convicted of second degree murder. On appeal, the defendant argued that second degree murder should not have been charged as a lesser included offense of felony murder. In concluding that second degree murder was a lesser included offense of felony murder, Judge Hayes, speaking for the court, ruled as follows:

> In this state, it is well-settled that once a homicide is established it is presumed to be second degree murder. See State v. Gentry, 881 S.W.2d 1, 4 (Tenn. Crim. App. 1993). In order to elevate the offense from second degree murder to first degree murder, the State must prove either that the homicide was committed with premeditation or that the homicide was committed during the perpetration of a statutorily enumerated felony. See Gentry, 881 S.W.2d at 4. The culpable mental state for murder in the second degree is that of "knowing." Tenn. Code Ann. § 39-13-210(a)(1). This differing mental state obviously indicates a lesser kind of culpability than required for felony murder. Accordingly, the offense of second degree murder is a lesser included offense of first degree murder, including commission of the homicide during the perpetration of a statutorily enumerated offense.

Bowers, slip op. at 4.

Recently, our supreme court in State v. Ely, ____ S.W.3d ____, Nos. E1998-00099-SC-R11-CD and E1999-00170-SC-R11-CD (Tenn. 2001), affirmed the decision in Bowers, when it held that second degree murder, reckless homicide, and criminally negligent homicide are lesser included offenses of felony murder under part (b) of the Burns test. It found that the elements of the lesser offenses were a subset of the elements of the greater and differed only in the mental state required. Ely, ____ S.W.3d at ____, slip op. at 11.

Having determined that not only second degree murder but also reckless homicide and criminally negligent homicide are lesser included offenses of felony murder, the next inquiry is

whether the evidence justified a jury instruction. Burns, 6 S.W.3d at 467. The guiding principle is that if there is evidence in the record from which the jury could conclude that a lesser included offense was committed, there must be an instruction for the lesser offense. See Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975). In Burns, our supreme court adopted a two-step process for determining whether the evidence justifies a jury instruction on a lesser included offense:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Burns, 6 S.W.3d at 469.

In our view, the evidence satisfies both prongs of the Burns test and justifies jury instructions on second degree murder, reckless homicide, and criminally negligent homicide. In his statement to police, the defendant confessed that he, Ms. Janikowski, and Kevin Gray planned to rob the victim by paging him and forcing him to drive to a remote location. The defendant's role was to detain the victim by use of the weapon acquired by Ms. Janikowski. He stated that when the victim arrived at the location behind the grocery store, he entered the backseat of the victim's car, pointed the weapon, and "got all shaky and . . . the gun went off," the bullet hitting the victim in the head. In the light most favorable to the defendant, it is our assessment that reasonable minds could find that the defendant's conduct in shooting the victim might have also constituted "second degree murder, reckless homicide, or criminally negligent homicide. Ely, ____ S.W.3d ____, slip op. at 15. It is also our conclusion that the evidence is legally sufficient to support a conviction for second degree murder. Had the defendant been convicted of second degree murder, it is our collective belief that the evidence would have been adequate to support the verdict of the jury. We therefore hold that the trial judge should have instructed the jury on second degree murder, reckless homicide, and criminally negligent homicide.

The trial judge, of course, has a duty to give a complete charge of the law applicable to the facts of the case. State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). There is an obligation "to charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so." Tenn. Code Ann. § 40-18-110(a). Pursuant to our statute and case law interpretations, defendants are entitled to jury instructions on all lesser offenses for which the evidence would support conviction. Complete instructions allow the jury to determine among each alternative the appropriate offense, if any, for conviction and more evenly balance the rights of the defendant and the state. It is only when the record is devoid of evidence to support an inference of guilt of the lesser offense that the trial court is relieved of the responsibility to charge the lesser crime. Stephenson, 878 S.W.2d at 549-50; State v. Boyd, 797 S.W.2d 589, 593 (Tenn. 1990).

In State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998), our supreme court rejected a line of cases which had concluded that the right to instructions on lesser offenses was founded in the Tennessee Constitution and instead ruled that entitlement was based solely upon the statutory requirement. Id. In consequence, the high court directed that any error in the omission of a lesser included offense would be subject to the following harmless error analysis:

> Reversal is required if the error affirmatively appears to have affected the result of the trial on the merits, or in other words, reversal is required if the error more probably than not affected the judgment to the defendant's prejudice.

Id. at 105.

In State v. Bolden, 979 S.W.2d 587 (Tenn. 1998), the defendant, who was charged with premeditated first degree murder, was willing to gamble on an "all or nothing" verdict by asking the trial judge not to charge the lesser included offense of second degree murder; the trial judge refused and the defendant was convicted on that lesser crime. While our supreme court affirmed that second degree murder conviction, its opinion emphasized the mandate of the statute requiring trial courts to "instruct the jury on all lesser offenses if the evidence introduced at trial is legally sufficient to support a conviction of the lesser offense." Id. at 593. Our supreme court also acknowledged that a "purpose of the statute is to protect the right to trial by jury by instructing the jury on the elements of all offenses embraced by the indictment [and to] facilitate[] the overall truth-seeking function of the process." Id. If the failure to charge a lesser included offense was an error of constitutional dimension, as Bolden implied, the proper question would have been whether the error was harmless beyond a reasonable doubt. In State v. Swindle, 30 S.W.3d 289, 293 (Tenn. 2000), however, our supreme court followed the rationale in Williams and held that reversal was required only "if the error affirmatively affected the result of trial, or if the error more probably than not affected the judgment to the defendant's prejudice." The high court concluded that the trial court's failure to instruct misdemeanor assault as a lesser included offense of the primary charge, aggravated sexual battery, was harmless error under Tenn. R. Crim. P. 52(a).

In State v. Ely, our supreme court clarified the holding in Williams and confirmed that the failure to charge a lesser included offense qualifies as an error of constitutional proportions:

> [T]he right of trial by jury is of constitutional dimension [as] evidenced by its embodiment in Article I, section 6 of the Tennessee Constitution, which states, "the right of trial by jury shall remain inviolate." Accordingly, we hold that this constitutional right is violated when the jury is not permitted to consider all offenses supported by the evidence.

Ely, _____ S.W.3d at _____, slip op. at 17 (emphasis in original). Our high court directed that in reviewing error arising from a failure to charge one or more lesser included offenses, "the proper inquiry for an appellate court is whether the error is harmless beyond a reasonable doubt." Id.

It is our view that the trial court's failure to charge second degree murder qualified as prejudicial error. As in State v. Ely, id. at 18,

> the jury in this case was given no option to convict of a lesser offense than felony murder. Although the evidence clearly was sufficient to support a conviction for second degree murder, reckless homicide, or criminally negligent homicide, the jury was not given an opportunity to reach a decision on these offenses. Under these circumstances, we cannot say the failure to instruct on the lesser-included offenses was harmless beyond a reasonable doubt.

Because the trial court committed prejudicial error by failing to instruct the jury on lesser included offenses, the conviction is reversed and the cause is remanded for a new trial.

_____
GARY R. WADE, PRESIDING JUDGE